IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GEORGE A.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | No. 18 C 8237 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff applied for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§416(I), 423, over five years ago. (Administrative Record (R.) 257-66). He claimed that he became disabled as of November 5, 2012, due to back and neck injuries, diabetes, high blood pressure, arthritis, heart condition, and glaucoma. (R. 238, 288). Over the next two and a half years, the plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. In this case, the appeals council accepted the plaintiff's request for review and purportedly adopted the ALJ's findings at steps one through five of the sequential evaluation process. (R. 4-5). It also made some of its own findings. (R. 5-6). As a result, it is this amalgam of appeals council and ALJ findings that is before the court for review. *Sims v. Apfel*, 530 U.S. 103, 106–07 (2000)(" . . . if the Appeals Council grants review of a claim, then the decision that the Council issues is the Commissioner's final decision."). Plaintiff asks the

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

court to remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

Plaintiff filed suit for review of the denial of his application back on December 15, 2018, and his case was assigned to Judge Jorge Alonso. Plaintiff filed his opening motion on April 3, 2019 [Dkt. #12], but the case was not fully briefed three months later on July 2, 2018. Two months after that, on September 16, 2019, the Executive Committee reassigned the case to the newly appointed District Judge, along with 340 other cases, and the parties were back at square one. [Dkt. #20]. In their initial status report, the parties informed the court that the case was fully briefed. [Dkt. #22, at 3]. On November 6, 2019, although the case had been fully briefed for over a year and half, the court asked the parties to file an additional round of briefing. [Dkt. #26]. It's unclear what the court was looking for, but as a result there are six briefs in this case instead of the standard three pursuant to Local Rule 16.4, and they appear to simply tread over the same ground repeatedly. Once those additional three briefs were filed, nothing at all happened for another year and a half until the parties finally consented to my jurisdiction on May 4, 2021 [Dkt. #38], and we were back, once again, at square one.

I.

A.

Plaintiff was born March 5, 1963 (R. 345), making him almost 55 years old when his insured status expired December 31, 2017. (R. 345). He dropped out of high school, but, for eleven years before, he claims he became disabled, he worked installing store displays, supervising two other people. The job kept him on his feet all day and required him to lift and carry up to fifty pounds. (R. 309, 328).

The record in this case, as it is in nearly all these cases, is lengthy and disorganized. It spans 1792 pages, 1400 pages of which are medical evidence. (R. 394-1792). Given the length of time this case has already spent in federal district court, we will dispense with a lengthy summary of that record. Suffice it to say that plaintiff has a number of physical problems: nerve impingement in his neck, carpal tunnel syndrome, disc issue with nerve impingement in his lumbar spine, a heart condition, sleep apnea, and insulin-dependent diabetes. As a result, he has had multiple surgeries: triple coronary bypass graft surgery in March 2016. (R. 641, 659, 1424), and a facetectomy, a hemilaminectomy, a foraminotomy, and a discectomy at L4-S1 on April 10, 2017 (R. 1316-19, 1714). He takes a host of medications, including carvedilol, furosemide, losartan, flexiril, oxycodone, hydrocodone, cyclobenzaprine, diazepam, gabapentin, omeprazole, tamsulosin, xanax, and insulin (R. 103, 634, 1457), and has also had a number of epidural steroid injections.

Plaintiff's problems appear to date back to a motor vehicle accident in December 2014, in which he injured his neck and shoulder. (R. 520). That resulted in moderate to severe pain thereafter, limited range of motion and moderate relief from medications. (R. 540, 549, 559, 561). On May 22, 2015, an EMG revealed carpal tunnel syndrome in the left wrist and left cervical radiculopathy of the C5-6 nerve root. (R. 563, 602). That resulted in tingling and numbness in both hands, diagnosed with bilateral carpal tunnel syndrome. Plaintiff forwent injections in his wrist at that point because he had to have an injection in his neck. (R. 471-72).

Next came lower back issues. On October 29, 2015, plaintiff exhibited decreased lower extremity reflexes and positive straight leg raise on the left. (R. 500). An MRI on November 24, 2015, showed a disc bulge at L4-5 with mild nerve impingement, stenosis, and probable annular tear, and disc bulge and protrusion at L5-6, with nerve root impingement, moderate left neuroforaminal

stenosis, and mild right neuroforaminal stenosis. (R. 599, 610). Plaintiff had decreased range of motion with severe pain throughout his lumbar spine. (R. 975). On February 8, 2016, lumbar extension, flexion, and rotation all limited. (R. 601). Eventually, conservative treatment failed, and plaintiff had to have multiple surgical procedures in April 2017, as already noted. (R. 1316-19, 1714). Through the summer of 2017, he was wearing a back brace or using a cane, and complaining of lower extremity pain, right shoulder pain, left-side sciatica, and weakness in summer of 2017 (R. 1447, 1450, 1461).

But, before that, in February of 2016 plaintiff suffered a heart attack. (R. 634). There was left main artery, left anterior descending artery, and obtuse marginal artery stenosis at 80%, 90%, and 70%, respectively. (R. 641, 659). He underwent a triple bypass a few days later. (R. 1424). In July 2017 and September 2017, plaintiff was complaining of chest pain and fatigue. (R. 1444, 1448, 1449).

**B.**

As already noted, in this instance, the decision from the appeals council is the one under review. The appeals council ("AC") adopted the ALJ's finding that the plaintiff was not engaging in substantial gainful activity. (R. 5). The AC also agreed that the plaintiff had the following severe impairments: "coronary artery disease (CAD) and degenerative disc disease of the lumbar and cervical spine." (R. 5). They adopted the ALJ's finding that the plaintiff had mild limitations in understanding, applying, and remembering information; in interacting with others; in concentrating, persisting, or maintaining pace; and in adapting or managing oneself. (R. 5). They also adopted the ALJ's conclusion that the plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment, specifically Listings 1.04 and 4.00. (R. 5). The AC made no

4

mention of plaintiff's other impairments; the ALJ said plaintiff's sleep apnea and diabetes were not severe. (R. 99-100).

Next, the AC adopted the ALJ's residual functional capacity finding; the plaintiff could perform light work except that he could not climb ladders, ropes, or scaffolds and could only occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs. He had to avoid concentrated exposure to temperature extremes. (R. 5). The AC then said the plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in the hearing decision." (R. 5). The AC then said it agreed with the following ALJ findings as the weight to be accorded to medical opinions: no weight to the opinion of Nadar Tobia; great weight to the opinion of treating source, Dr. Bervelee Brisbin; state agency opinions were supported by the evidence as a whole. (R. 5).

The AC then agreed with the ALJ that there should be no weight given the March 2017 opinion of treating physician Dr. Nadar Tobia[2], but went on to assign "little weight" to the doctor's April 2017 opinion. They said his opinion was issued just two weeks after the plaintiff's hemilaminectomy and medial facetectomy with foraminotomy. The AC added that the records indicated that the plaintiff was recovering well and could resume normal activity. Although the plaintiff had to use a cane to walk, his strength was normal, reflexes were normal, and he had a normal gait. (R. 5).

---

[2]The ALJ accorded the March 2017 opinion of Dr. Tobia no weight. She said there were minimal findings supporting the severe restriction the doctor placed on the plaintiff – such as being unable to lift ten pounds, difficulty handling and fingering. And, the ALJ said the doctor was not a specialist. (R. 103-04).

Finally, the AC adopted the hearing testimony of the vocational expert and found that plaintiff could perform work that exists in significant numbers in the national economy: cashier II (DOT#211.462-010; 736,000 jobs); sales attendant (DOT#299.677-101; 250,000 jobs); office helper (DOT#239.567-010; 60,000 jobs). (R. 6). Accordingly, the AC concluded that the plaintiff was not disabled under the Social Security Act and was not entitled to disability insurance benefits. (R. 7).

## II.

If the ALJ's decision is supported by "substantial evidence," the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. *See* 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014). To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Beardsley*, 758 F.3d at 837. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997); *Schloesser v. Berryhill*, 870 F.3d 712, 717 (7th Cir. 2017).

But, in the Seventh Circuit, the ALJ also has had for many years an obligation to build what is called an "accurate and logical bridge" between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir. 2010). The court has said it must be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v.*

*Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). Even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build what *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) called the "logical bridge" between the endeavor and the result: "we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."[3] *See also Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010)("The government seems to think that if it can find enough evidence in the record to establish that the administrative law judge might have reached the same result had she considered all the evidence and evaluated it as the government's brief does, it is a case of harmless error. But the fact that the administrative law judge, had she considered the entire record, might have reached the same result does not prove that her failure to consider the evidence was harmless. Had she considered it carefully, she might well have reached a different conclusion.").

But, at the same time, the Seventh Circuit has also called this requirement "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). "If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d

---

[3] The "logical bridge" requirement made its first appearance in Social Security cases in Judge Posner's opinion in *Sarchet*. However, its phrasing traces its lineage to Judge Spottswood Robinson's opinion in the non-Social Security case of *Thompson v. Clifford*, 408 F.2d 154 (D.C.Cir. 1968), where Judge Robinson said: "'Administrative determinations must have a basis in law' and their force depends heavily on the validity of the reasoning in the logical bridge between statute and regulation." 408 F.2d at 167.

284, 287-88 (7th Cir. 1985).[4] But no matter what one's view of the "logical bridge" requirement, no one suggests that the "accurate and logical bridge" must be the doctrinal equivalent of the Pont Neuf. *See also Brumbaugh v. Saul*, 850 Fed.Appx. 973, 977 (7th Cir. 2021)("the 'logical bridge' language in our case law is descriptive but does not alter the applicable substantial evidence standard.").

### III.

### A.

As it happens, this is a "logical bridge" case. It is often said that courts must apply a common-sense approach to reviewing an ALJ's decision. *Winsted v. Berryhill*, 923 F.3d 472, 478

---

[4] Prior to *Sarchet's* "logical bridge" language, the court generally employed the phrase "minimal articulation" in describing an ALJ's responsibility to address evidence. *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985)(collecting cases). The court's focus was on whether an ALJ's opinion assured the reviewing court that the ALJ had considered all significant evidence of disability. In *Zblewski v. Schweiker*, 732 F.2d 75 (7th Cir. 1984), for example, the court "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and evidence submitted," but only "a minimal level of articulation of the ALJ's assessment of the evidence ... in cases in which considerable evidence is presented to counter the agency's position." *Zblewski*, 732 F.2d at 79. In *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985), the court rejected a plaintiff's argument that an ALJ failed to adequately discuss his complaints of pain and was more explicit about how far ALJs had to go to explain their conclusions:

> We do not have the fetish about findings that [the plaintiff] attributes to us. The court review judgments, not opinions. The statute requires us to review the quality of the evidence, which must be "substantial," not the quality of the ALJ's literary skills. The ALJs work under great burdens. Their supervisors urge them to work quickly. When they slow down to write better opinions, that holds up the queue and prevents deserving people from receiving benefits. When they process cases quickly, they necessarily take less time on opinions. When a court remands a case with an order to write a better opinion, it clogs the queue in two ways—first because the new hearing on remand takes time, second because it sends the signal that ALJs should write more in each case (and thus hear fewer cases).

> The ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires him to do.... This court insists that the finder of fact explain why he rejects uncontradicted evidence. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

766 F.2d at 287 (citations omitted).

8

(7th Cir. 2019); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). The decision in this case says that a fifty-five-year-old man with less than a high school education and work experience limited to installation of store displays, who has both cervical spine and lumbar spine issues with radiculopathy, as well as carpal tunnel issues, drowsiness and fatigue issues from sleep apnea, an array of medication, and heart surgery, and who, in the two years leading up to the expiration of his insured status was either in bad enough shape to require multiple lumbar spine procedures and a triple bypass or was recovering from those surgeries, was somehow able to perform nearly a full range of light work during that same period. That means he had to be on his feet, walking or standing, most of every day. He had to be lifting up to twenty pounds and frequently carrying ten. *Murphy v. Colvin*, 759 F.3d 811, 818 (7th Cir. 2014). To be sure, the ALJ and the ATTORNEY-CLIENT didn't think plaintiff could do a *full* range of light work. They thought he could *only* stoop, kneel, crouch, crawl, and climb ramps and stairs – post bypass surgery along with his back and neck impairments – for up to two hours every day. All of this, for five days a week, fifty weeks a year, seems a stretch.

There are two suspicions regarding this overly optimistic assessment. The first is that the ALJ failed to appreciate the cumulative effect of the plaintiff's many impairments. An ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe. *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). When one combines all the back and neck issues with the heart condition, even assuming successful surgeries, there would seem to be a significant period of time where these impairments would have combined to preclude six hours of walking and standing every day, or repetitive lifting, and certainly climbing stairs and kneeling and crawling. And, what about plaintiff's carpal tunnel

9

causing numbness in his hands? The ALJ seemed to have ignored that completely – there are no handling or fingering limitations – unless she lumped it in with his cervical spine impairment. What about the side effects – drowsiness is documented – from the pharmacy of medications the plaintiff takes? The ALJ mentioned them, but did not discuss them – more on that later. This case must be remanded for the ALJ to clearly consider the combined effect of plaintiff's many impairments, both severe and non-severe.

The second suspicion is a more cynical. Obviously, a neutral observer may not necessarily think that plaintiff is disabled, and might wonder why the ALJ simply did not find him capable of sedentary work, or even light work. The likely reason is the proverbial elephant in the room: plaintiff's age. See *Dimmett v. Colvin*, 816 F.3d 486, 488 (7th Cir. 2016)("One might think that even though [s]he can't do medium work [s]he can do light or sedentary work. But h[er] age makes the distinction between medium and light work critical: a person of h[er] age who has no skills transferable to light or sedentary work is presumptively disabled."). At 54 years and 10 months, plaintiff was in the category of "closely approaching advanced age." 20 CFR § 404.1563(d). That means a finding that he could perform sedentary work – a far more logical conclusion in this case – would mean that, with his limited education and lack or transferable skills, the Medical Vocational Guidelines would direct a conclusion of "disabled." 20 C.F.R. pt. 404, subpt. P, app. 2, Rule 201.09, 201.10; *see also Anderson v. Berryhill*, 711 F. App'x 796, 797 (7th Cir. 2018). So, in this case, light work was the baseline if a finding of "not disabled" was to be made.

Plaintiff's age was also a significant consideration. Once over 55, plaintiff would be of advanced age and would be disabled under the Medical Vocational Guidelines even with a capacity for light work:

10

> However, for individuals of advanced age who can no longer perform vocationally relevant past work and who have a history of unskilled work experience, or who have only skills that are not readily transferable to a significant range of semi-skilled or skilled work that is within the individual's functional capacity, or who have no work experience, the limitations in vocational adaptability represented by functional restriction to light work warrant a finding of disabled. Ordinarily, even a high school education or more which was completed in the remote past will have little positive impact on effecting a vocational adjustment unless relevant work experience reflects use of such education.

20 C.F.R. § Pt. 404, Subpt. P, App. 2, §. 202.00(c); 20 C.F.R. § 404.1568(d)(4). Here, plaintiff wasn't just "closely approaching advanced age," he was on the cusp – 64 days away. That's a borderline age situation, and the Commissioner handles those in a particular way, with the regulations directing that age categories not be applied mechanically in such situations. *Heckler v. Campbell*, 461 U.S. 458, 462 n.5 (1983). 20 CFR § 404.1563(b) provides:

> How we apply the age categories. When we make a finding about your ability to do other work under § 404.1520(f)(1), we will use the age categories in paragraphs (c) through (e) of this section. We will use each of the age categories that applies to you during the period for which we must determine if you are disabled. We will not apply the age categories mechanically in a borderline situation. If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case.

Here, the ALJ did discuss the borderline situation, explaining that two months was too far away and plaintiff's education was at the high end of the "limited education" category. (R. 105). We're not sure about either of those rationales. If two months is so long a time, why does the regulation say "a few days to a *few* months"? The subtle eleventh grade distinction the ALJ made makes little sense in the face of a regulation that specifically says that "even a high school education or more which was completed in the remote past will have little positive impact on effecting a vocational adjustment unless relevant work experience reflects use of such education." Plaintiff

dropped out of high school *thirty years ago*. The ALJ's rationale for applying the age categories mechanically in this case makes not sense.

**B.**

So, while this case must be remanded, at least a few other points should be discussed. Earlier, the side effects of plaintiff's medication were mentioned. Plaintiff takes *a lot* of medication, including a couple of narcotics, which bolsters his claims that he still experiences severe pain. *See, e.g., Plessinger v. Berryhill*, 900 F.3d 909, 916 (7th Cir. 2018)("The ALJ also did not address the fact that [plaintiff's] allegations of pain were consistent with the strong prescription pain medication he was taking."); *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016)(ALJ ignored the fact that plaintiff was taking strong narcotics for pain); *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) (finding doctor's prescription for strong pain medications corroborated claimant's credibility regarding pain). Plaintiff testified at his hearing that he is too dizzy from his medications to drive. His March 2016 heart surgery has also left him drowsy. (R. 128, 177, 1130-1131). His CPAP machine and his medications adversely affect his sleep; he naps every day for an hour and a half or two hours. (R. 136). The ALJ noted that the plaintiff "testified that the combination of medications he has been prescribed causes him to feel drowsy and dizzy." (R. 102). The sedative side effects were also noted in the medical record. (R. 500, 502). But the ALJ completely ignored them. There was no discussion in the Opinion, no mention, no indication of whether the ALJ believed the plaintiff or didn't.

SSR 16-3p directs an ALJ to consider the "type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms . . . ." An ALJ can't simply ignore allegations and evidence that a plaintiff is drowsy throughout the day. *Williams v.*

12

*Berryhill*, 707 F. App'x 402, 406 (7th Cir. 2017); *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)(plaintff reported drowsiness from medications to doctor); *Ramey v. Astrue*, 319 F. App'x 426, 429 (7th Cir. 2009); *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir.2004). Although the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and explain why it was rejected. *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021); *Reinaas v. Saul*, 953 F.3d 461, 467 (7th Cir. 2020)(". . . ALJ may not ignore an entire line of evidence contrary to her ruling."). An ALJ can't simply ignore a line of evidence that suggest a plaintiff is unable to sustain work and certainly cannot ignore medications' side effects documented in the medical record.

One other problem here is the fact that both the ALJ and the ATTORNEY-CLIENT seemed to hang their collective hats on the single medical opinion in the record that arguably suggested plaintiff had a capacity for light work. Both the ALJ's/AC's decision to accord "great weight" to the June 30, 2015 opinion of treating source, Dr. Beverlee Brisbin. The ALJ said the opinion that plaintiff "could return to 'light duty' with avoidance of heavy lifting or repetitive bending" was "consistent with the medical evidence at the time as well as the [plaintiff's] own statements made to Dr. Brisbin about his capacity to perform light work." (R. 104). The ATTORNEY-CLIENT doubled down, saying they "agree[d] that great weight should be assigned to treating source Dr. Beverlee Brisbin." (R. 5). There are a couple of problems with that.

On June 30, 2015, plaintiff told Dr. Brisbin that he was 80% improved, no radiculopathy, and felt "as though he would be able to return to light duty work." (R. 504). Plaintiff added that he rarely required pain medication. (R. 504). Upon examination, the doctor noted a normal gait, normal neurological findings, no tenderness, and improved range of motion. (R. 504). She said, "[a]s far

13

as return to work, I think it is reasonable for him to return to work in light duty with avoidance of any type of heavy lifting or repetitive bending. He will continue with home exercise program . . . return to work effective 7/6/15." (R. 504).

The first issue with reliance on this opinion is terminology. "Light duty" and "light work" are not necessarily the same thing, and the ALJ ought not to have equated one with the other. *See Heckler v. Campbell*, 461 U.S. 458, 472 (1983)(Brennan, J., concurring)(". . . the Administrative Law Judge did not . . . make any inquiry whether by "light-duty work" the first doctor meant the same thing as the Secretary's term "light work."); SSR 96-5p ("From time-to-time, medical sources may provide opinions that an individual is limited to "sedentary work," "sedentary activity," "light work," or similar statements that appear to use the terms set out in our regulations and Rulings to describe exertional levels of maximum sustained work capability. Adjudicators must not assume that a medical source using terms such as "sedentary" and "light" is aware of our definitions of these terms."). Moreover, the ALJ didn't even read the opinion correctly. Plaintiff did not say he thought he could return to "light work," he – like Dr. Brisbin – used the term "light duty."

More importantly, however, this opinion – the only medical opinion the ATTORNEY-CLIENT and the ALJ accorded great weight to – turned out to be overly optimistic. At a follow-up exam on July 17, 2015, plaintiff reported some stiffness in his neck, but still felt he could work. Dr. Brisbin gave him a note to return to full duty effective 7/20/15. (R. 503). When plaintiff returned to see Dr. Brisbin on August 28, 2015, he had tried going back to work but his condition had deteriorated. He had pain in his neck radiating down his left arm. There was stiffness and limitation of motion in all planes in his neck. This was consistent with MI findings which showed abnormality at C5-6 and an EMG demonstrating C5-6 radiculopathy. Dr. Brisbin discussed epidural

14

injections as an option. She prescribed Norco, one to two 325 mg tablets every eight to twelve hours. (R. 502).

By October 29, 2015, things were even worse. Plaintiff had low back pain radiating down his left leg and neck pain radiating down his left arm. He was unable to work at all as of October 13th. Reflexes were limited and straight leg raising positive. (R. 500). Dr. Brisbin felt plaintiff was unable to tolerate physical therapy. (R. 500-01). She recommended he continue to wear a back brace as needed for comfort. (R. 500). She increased the Norco prescription to two tablets every four to six hours. (R. 500). So much for "rarely" requiring pain medication, which was a point the ALJ focused on in his discussion of the June 30, 2015 opinion.

Clearly, the June 30, 2015 opinion was, for our purposes here, meaningless. It was certainly not entitled to great weight, or any weight for that matter. An ALJ must not rely on a physician's assessment "if later evidence containing new, significant medical diagnoses reasonably could have changed" the physician's views. *Pavlicek v. Saul*, 994 F.3d 777, 783–84 (7th Cir. 2021); *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018); *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016). Not only did the findings change in a matter of weeks, they changed so much that plaintiff required a facetectomy, a hemilaminectomy, a foraminotomy, a discectomy at L4-S1, and coronary bypass graft surgery. In short, there was no logic in assigning great weight to the June 30, 2015 opinion, which turned out to be little more than a snapshot of plaintiff's condition on that day.

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for summary judgment [Dkt. #12] is granted, the defendant's motion for summary judgment [Dkt. #17] is denied, and this case is remanded to the Commissioner.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 1/28/22